DISTRICT OF COLUMBIA, ss:

## <u>DECLARATION OF MARIANO BAÑOS</u>



I, Mariano Baños, declare and say as follows:

1. I am an Attorney-Adviser in the Office of the Legal Adviser for the Department of State, Washington, D.C. This office has responsibility for extradition requests within the Department of State, and I am familiar with the extradition case of Alex Dion. I make the following statements based upon my personal knowledge and upon information made available to me in the performance of my official duties.

2. The relevant and applicable treaty provisions in full force and effect between the United States and Australia are found in the Treaty on Extradition between the United States of America and Australia, signed on May 14, 1974 ("1974 Extradition Treaty") and the Protocol Amending the Treaty on Extradition between the United States of America and Australia of May 14, 1974, signed on September 4, 1990 ("1990 Protocol"). A copy of the 1974 Extradition Treaty and 1990 Protocol are attached to this declaration.

3. In accordance with the provisions of the 1974 Extradition Treaty, as amended, the Embassy of Australia has submitted Diplomatic Note No. 279/2018 formally requesting the extradition of Alex Dion. A copy of the diplomatic note is attached to this declaration.

4. In accordance with Article XVIII of the 1974 Extradition Treaty, as amended by Article 14 of the 1990 Protocol, the Government of the United States represents the interests of Australia in any proceedings arising out of a request for extradition made by Australia, and the Government of Australia represents the interests of the United States in any proceedings arising out of a request for extradition made by the United States.

19011427-5

# United States of America



## DEPARTMENT OF STATE

### *To all to whom these presents shall come, Greetings:*

...tify That Mariano Baños, whose name is subscribed to the document hereunto annexed, was at ...of subscribing the same Attorney-Adviser, Office of the Legal Adviser, Department of State, ...tates of America, and that full faith and credit are due to his acts as such.

*This certificate is not valid if it is removed or altered in any way whatsoever*



In testimony whereof, I, Michael R. Pompeo, Secretary of State , have hereunto caused the seal of the Department of State to be affixed and my name subscribed by the Assistant Authentication Officer, of the said Department, at the city of Washington, in the District of Columbia, this eleventh day of December, 2018.

*Michael R. Pompeo*
Secretary of State

By _____
Assistant Authentication Officer,
Department of State

Issued p... to... State of
Sept. 15... 1... ...-69; 22
USC 26... ...USC... 5 USC
301; 28... 733 ... 8 USC
1443(f); ... ...44 Fe... Rules of
Civil Proce...

EX-DION-000002

5. The offense for which extradition is sought is covered under Article II of the 1974 Extradition Treaty, as amended by Article 1 of the 1990 Protocol.

6. The documents submitted by the Embassy of Australia in support of the extradition request were certified on October 23, 2018, by James Carouso, Chargé d' Affaires, Embassy of the United States of America in Australia, in accordance with 18 U.S.C. § 3190. At the time of his certification, Mr. Carouso was the principal diplomatic officer of the United States in Australia.

I declare under the penalty of perjury that the foregoing is true and correct.

Executed on December 11, 2018.

MARIANO BANOS

Attachments:
1. Copy of Note
2. Copy of Treaty and Protocol



Note No. 279/2018

2018 NOV -6 P 2:42
DEPARTMENT OF STATE
L/LEI

The Embassy of Australia presents its compliments to the United States Department of State and has the honour to present a request for the extradition of one male person, namely:-

- Mr Alex Dion (also known as Ahmad Arnaout), a citizen of the United States of America born on 3 June 1980 in Tripoli, Lebanon.

Dion's extradition is requested so that he may be prosecuted in Australia for the following offence:

- murder contrary to paragraph 18(1)(a) of the *Crimes Act 1900* (NSW).

This request is made by Australia in accordance with the *Treaty on Extradition Between Australia and the United States of America* done at Washington on 14 May 1974, as amended by the *Protocol amending the Treaty on Extradition Between Australia and the United States of America* done at Seoul on 4 September 1990 (the Treaty).

The duly authenticated documentation required under Article XI of the Treaty in support of the extradition request is enclosed.

Pursuant to Article XVII of the Treaty, the Australian Government requests the surrender, to the extent permitted by the law of the United States of America, of all articles, documents and evidence connected with the offence for which Dion's extradition is sought.

The following Australian official may be contacted in connection with this request for extradition:

Mr Eric Raymond
Senior Legal Officer
International Crime Cooperation Central Authority
Australian Attorney-General's Department

2

3-5 National Circuit
BARTON ACT 2600

Email: Eric.Raymond@ag.gov.au
Telephone: +61 2 6141 2578
Facsimile: +61 2 6141 5457

The Australian Government thanks the United States Government in advance for its consideration of this request.

The Embassy of Australia avails itself of this opportunity to renew to the Department of State the assurances of its highest consideration.

WASHINGTON, D.C.
5 November 2018

# EXTRADITION

Treaty Between the
UNITED STATES OF AMERICA
and AUSTRALIA

Signed at Washington May 14, 1974



# AUSTRALIA

## Extradition

*Treaty signed at Washington May 14, 1974;*
*Ratification advised by the Senate of the United States*
*of America December 1, 1975;*
*Ratified by the President of the United States of*
*America December 16, 1975;*
*Ratified by Australia December 22, 1975;*
*Ratifications exchanged at Canberra April 8, 1976;*
*Proclaimed by the President of the United States of*
*America May 5, 1976;*
*Entered into force May 8, 1976.*

———

## BY THE PRESIDENT OF THE UNITED STATES OF AMERICA

## A PROCLAMATION

CONSIDERING THAT:

The Treaty on Extradition between the United States of America and Australia was signed at Washington on May 14, 1974, the original of which Treaty is hereto annexed;

The Senate of the United States of America by its resolution of December 1, 1975, two-thirds of the Senators present concurring therein, gave its advice and consent to ratification of the Treaty;

The Treaty was ratified by the President of the United States of America on December 16, 1975, in pursuance of the advice and consent of the Senate, and has been duly ratified on the part of Australia;

The respective instruments of ratification were exchanged at Canberra on April 8, 1976;

It is provided in Article XXI of the Treaty that the Treaty shall enter into force thirty days after the exchange of instruments of ratification;

Now, THEREFORE, I, Gerald R. Ford, President of the United States of America, proclaim and make public the Treaty, to the end that it shall be observed and fulfilled with good faith on and after May 8, 1976, by the United States of America and by the citizens of the United States of America and all other persons subject to the jurisdiction thereof.

EX-DION-000007

2

IN TESTIMONY WHEREOF, I have signed this proclamation and caused the Seal of the United States of America to be affixed.

DONE at the city of Washington this fifth day of May in the year of our Lord one thousand nine hundred seventy-six and of the Independence of the United States of America the two hundredth.

[SEAL]

GERALD R. FORD

By the President:
   JOSEPH JOHN SISCO
      *Acting Secretary of State*

EX-DION-000008

### TREATY ON EXTRADITION BETWEEN
### THE UNITED STATES OF AMERICA AND AUSTRALIA

The United States of America and Australia, desiring to make more effective the cooperation of the two countries for the reciprocal extradition of offenders, agree as follows:

EX-DION-000009

## ARTICLE I

Each Contracting Party agrees, under the conditions and circumstances established by this Treaty, reciprocally to deliver up persons found in its territory who have been charged with or convicted of any of the offenses mentioned in Article II of this Treaty committed within the territory of the other Contracting Party, or outside that territory under the conditions specified in Article IV of this Treaty.

## ARTICLE II

(1) Persons shall be delivered up according to the provisions of this Treaty for any of the following offenses provided these offenses are punishable by the laws of both Contracting Parties by a term of imprisonment exceeding one year or by death:

1. Murder or willful murder; assault with intent to commit murder.

2. Manslaughter.

3. Aggravated or willful wounding or injuring; assault occasioning actual bodily harm.

4. Unlawful throwing or application of any corrosive or injurious substances upon the person of another.

5. Rape; indecent assault, including unlawful sexual acts with or upon children.

6. Illegal abortion.

7. Procuring, or trafficking in, women or young persons for immoral purposes; living on the earnings of prostitution.

8. Abandoning or exposing a child when the life of that child is or is likely to be injured or endangered.

TIAS 8234

EX-DION-000010

9. Bigamy.

10. Kidnapping; child stealing; abduction; false imprisonment.

11. Robbery.

12. Burglary; housebreaking or any similar offense.

13. Larceny.

14. Embezzlement.

15. Obtaining any property, money or valuable securities by false pretenses or other form of deception.

16. An offense against the law relating to bribery.

17. Extortion.

18. Receiving any property, money or valuable securities knowing the same to have been unlawfully obtained.

19. Fraud by an agent, bailee, banker, factor or trustee, by a director or officer of a company or by a promoter of a company, whether existing or not.

20. An offense relating to counterfeiting or forgery.

21. Perjury; subornation of perjury; conspiring to defeat the course of justice.

22. Arson.

23. An act done with the intention of endangering the safety of any person traveling upon a railway or in any aircraft or vessel or other means of transportation.

24. Any seizure or exercise of control, by force or violence or threat of force or violence, or by any other form of intimidation, of an aircraft.

25. Piracy, by statute or by law of nations; revolt on board a vessel against the authority of the master of the vessel.

EX-DION-000011

6

26. Malicious injury to property.

27. An offense against the bankruptcy laws.

28. An offense against the laws relating to narcotics, dangerous drugs or psychotropic substances.

29. Dealing in slaves.

(2) Extradition shall also be granted for any other offenses that are made extraditable under the extradition laws of Australia and which are felonies under the laws of the United States of America.

(3) Extradition shall also be granted for any offense against a federal law of the United States of America of which one of the above-mentioned offenses is a substantial element, even if transporting or transportation or the use of the mails or of interstate facilities is also an element of the specific offense.

(4) Extradition shall also be granted for aiding, abetting, counseling or procuring the commission of, being an accessory before or after the fact to, or attempting or conspiring to commit, any of the offenses mentioned in the preceding paragraphs of this Article.

(5) If extradition is requested for any offense mentioned in a preceding paragraph of this Article and that offense is punishable under the laws of both Contracting Parties by a term of imprisonment exceeding one year or by death, that offense shall be extraditable under the provisions of this Treaty whether or not the laws of both Contracting Parties would place that offense within the same category of offenses made extraditable by that preceding paragraph of this Article and whether or not the laws of the requested State denominate the offense by the same terminology.

EX-DION-000012

## 7

### ARTICLE III

(1) For the purposes of this Treaty, the territory of a Contracting Party means all the territory under the jurisdiction of that Contracting Party, including airspace and territorial waters, and also includes –

    (a) any vessel registered in any territory under the jurisdiction of that Contracting Party; and

    (b) any aircraft registered in any such territory provided that the aircraft is in flight when the relevant offense is committed.

(2) For the purposes of this Treaty –

    (a) the territory under the jurisdiction of a Contracting Party includes the Territories for the international relations of which that Contracting Party is responsible;

    (b) an aircraft shall be considered in flight from the moment when the power is applied for the purpose of take-off until the moment when the landing run ends.

### ARTICLE IV

When the offense for which extradition has been requested has been committed outside the territory of the requesting State –

    (a) if the United States of America is the requested State – the executive authority of the United States of America; or

    (b) if Australia is the requested State – the Attorney-General of Australia,

shall have the power to grant the extradition if the laws of the requested State provide for jurisdiction over such an offense committed in similar circumstances.

TIAS 8234

8

ARTICLE V

(1)  Neither of the Contracting Parties shall be bound to deliver up its own nationals under this Treaty but the executive authority of each Contracting Party shall have the power to deliver them up if, in its discretion, it considers that it is proper to do so.

(2)  For the purposes of this Article -

(a)  a reference to the executive authority of a Contracting Party shall, in the case of Australia, be construed as a reference to the Attorney-General of Australia;

(b)  Australian protected persons shall be deemed to be nationals of Australia; and

(c)  the nationality of a person shall be determined to be that which he held at the time when he was charged with the offense for which his extradition is requested.

ARTICLE VI

Extradition shall be granted only if the evidence is found sufficient, according to the laws in the territory where the person whose extradition is requested is found, either to justify his trial or committal for trial if the offense with which he is charged or its equivalent had been committed in that territory or to prove that he is the identical person convicted by the courts of the requesting State.

EX-DION-000014

9

## ARTICLE VII

(1) Extradition shall not be granted in any of the following circumstances:

(a) when the person whose extradition is requested is being proceeded against, has been tried and discharged or punished, or has been pardoned, in the territory of the requested State for the offense for which his extradition is requested;

(b) when the prosecution for the offense has become barred by lapse of time according to the laws of the requesting State; or

(c) when the offense in respect of which extradition is requested is of a political character, or the person whose extradition is requested proves that the extradition request has been made for the purpose of trying or punishing him for an offense of a political character.

(2) If any question arises whether a case comes within the provisions of subparagraph (c) of paragraph (1) of this Article, the requested State shall decide that question.

## ARTICLE VIII

If, under the law of the requesting State, an offense for which the extradition of a person is requested, or any other offense for which he may be detained or tried under paragraph (1) of Article XIV, is subject to a penalty of death but the law of the requested State does not provide for such a penalty in a similar case, the requested State may recommend to the requesting State that any punishment imposed for any of those offenses be a less severe punishment.

### ARTICLE IX

When the person whose extradition is requested is being proceeded against or is serving a sentence in the territory of the requested State for an offense other than that for which extradition has been requested, his surrender may be deferred until the conclusion of the proceedings and the full execution of any punishment that may be or may have been imposed on him.

### ARTICLE X

The determination that extradition based upon the request therefor should or should not be granted shall be made in accordance with the law of the requested State and the person whose extradition is sought shall have the right to use such remedies and recourses as are provided by that law.

### ARTICLE XI

(1) The request for extradition shall be made through the diplomatic channel.

(2) The request shall be accompanied by a description of the person sought, a statement of the facts of the case, the text of the applicable laws of the requesting State including the law defining the offense, the law prescribing the punishment for the offense and the law relating to the limitation of the legal proceedings.

(3) When the request relates to a person who has not yet been convicted, it must also be accompanied by a warrant of arrest issued by a judge or other judicial officer of the requesting State and by such evidence as, according to the laws of the requested State,

EX-DION-000016

would justify his trial or committal for trial if the offense had been committed there, including evidence proving the person requested is the person to whom the warrant of arrest refers.

(4) When the request relates to a person already convicted, it must be accompanied by the judgment of conviction and sentence, if any, passed upon him in the territory of the requesting State, by a statement, if applicable, showing how much of the sentence has not been served and by evidence proving that the person requested is the person to whom the judgment refers.

(5) The warrant of arrest and deposition or other evidence, given under oath or affirmed, and the judicial documents establishing the existence of the conviction, or certified copies of those documents, shall be admitted in evidence in the examination of the request for extradition when —

(a) in the case of a request by Australia — those documents or certified copies bear the signature, or are accompanied by the attestation, of a judge, magistrate or officer of Australia or are authenticated by the official seal of the Attorney-General and, in any case, are certified by the principal diplomatic or consular officer of the United States of America in Australia; or

(b) in the case of a request by the United States of America — the warrant, if any, bears an original signature, or the other documents are certified, by a judge, magistrate or officer of the United States of America and, in any case, are authenticated by the oath of a witness or sealed with the official

EX-DION-000017

seal of the Department of State on behalf of the Secretary of
State or of the Department of Justice on behalf of the
Attorney General.

ARTICLE XII

(1)  In case of urgency a Contracting Party may apply for the
provisional arrest of the person sought pending the presentation of
the request for extradition through the diplomatic channel.

(2)  The application shall contain a description of the person
sought, an indication of intention to request the extradition of
the person sought and a statement of the existence of a warrant of
arrest or a judgment of conviction against that person, and such
further information, if any, as would be necessary to justify the
issue of a warrant of arrest had the offense been committed, or the
person sought been convicted, in the territory of the requested
State.

(3)  On receipt of such an application the requested State
shall take the necessary steps to secure the arrest of the person
claimed.

(4)  A person arrested upon such an application shall be set at
liberty upon the expiration of forty-five days from the date of his
arrest if a request for his extradition accompanied by the documents
specified in Article XI has not been received.

(5)  Paragraph (4) of this Article shall not prevent the
institution of proceedings with a view to extraditing the person
sought if the request is subsequently received.

## ARTICLE XIII

(1) If the requested State requires additional evidence or information to enable it to decide on the request for extradition, that State may request that such evidence or information be furnished within such period as it specifies.

(2) If the person sought is under arrest and the additional evidence or information submitted as aforesaid is not sufficient or if such evidence or information is not received within the period specified by the requested State, he shall be discharged from custody.

(3) The discharge of a person from custody under paragraph (2) of this Article shall not bar the requesting State from submitting another request in respect of the same offense.

## ARTICLE XIV

(1) A person extradited under this Treaty may be detained, tried or punished in the territory of the requesting State for any offense mentioned in Article II for which the person could be convicted upon proof of the facts upon which the request for extradition was based.

(2) Except as provided in paragraph (1) of this Article, a person extradited under this Treaty shall not be detained, tried or punished in the territory of the requesting State for an offense other than that for which extradition has been granted, or be extradited by that State to a third State, unless —

(a) he has left the territory of the requesting State after his extradition and has voluntarily returned to it;

EX-DION-000019

(b) he has not left the territory of the requesting State within thirty days after being free to do so; or

(c) the offense concerned is one for which the requested State has consented to his detention, trial or punishment or to his extradition to a third State and is an offense mentioned in Article II.

(3) A request for the consent of the requested State under subparagraph (c) of paragraph (2) of this Article shall be accompanied by such information and documents as are requested by that State.

(4) This Article does not apply to offenses committed after the extradition.

## ARTICLE XV

A requested State, upon receiving two or more requests for the extradition of the same person either for the same offense, or for different offenses, shall determine to which of the requesting States it will extradite the person sought, taking into consideration the circumstances and particularly the possibility of a later extradition between the requesting States, the seriousness of each offense, the place where the offense was committed, the nationality and residence of the person sought, the dates upon which the requests were received and the provisions of any extradition agreements between the requested State and the other requesting State or States.

ARTICLE XVI

(1)  The requested State shall promptly communicate to the requesting State through the diplomatic channel the decision on the request for extradition.

(2)  Where extradition of a person for an offense is granted, the person shall be conveyed by the appropriate authorities of the requested State to a port or airport in the territory of that State agreed between that State and the requesting State.

(3)  If a warrant or order for the extradition of a person sought has been issued by the competent authority and he is not removed from the territory of the requested State within such time as is prescribed by the laws of that State, he may be set at liberty, and the requested State may subsequently refuse to extradite that person for the same offense.

(4)  Australia is not required to extradite a person before the expiration of fifteen days after the date on which he has been held judicially to be liable to extradition, or, if proceedings for a writ of habeas corpus have been brought, before the expiration of fifteen days after the final decision of the competent court has been given.

ARTICLE XVII

(1)  To the extent permitted under the law of the requested State and subject to the rights of third parties, which shall be duly respected, all articles found in the requested State that have been acquired as a result of the offense or may be required as evidence shall, if the requesting State so requests, be surrendered if extradition is granted.

EX-DION-000021

(2)  Subject to the qualifications of paragraph (1) of this Article, the above-mentioned articles shall, if the requested State so requests, be surrendered to the requesting State even if the extradition, having been agreed to, cannot be carried out owing to the death or escape of the person sought.

(3)  Where the law of the requested State or the rights of third parties so require, any articles so surrendered shall be returned to the requested State free of charge if that State so requests.

### ARTICLE XVIII

(1)  Expenses related to the transportation of the person sought to the requesting State shall be paid by the requesting State.

(2)  The requested State shall make all necessary arrangements for, and meet the cost of, the representation of the requesting State in any proceedings arising out of a request for extradition.

(3)  No pecuniary claim, arising out of the arrest, detention, examination and surrender of persons sought under the terms of this Treaty, shall be made by the requested State against the requesting State.

### ARTICLE XIX

(1)  The right to transport through the territory of one of the Contracting Parties a person surrendered to the other Contracting Party by a third State shall be granted on request made through the diplomatic channel.

(2)  In the case of a national of the requested State, the request shall establish that conditions are present which would warrant extradition of the person by the State of transit.

EX-DION-000022

(3) The request may be refused if reasons of public order are opposed to the transit.

(4) Permission for the transit of a person surrendered shall include authorization for accompanying officials to hold that person in custody or request and obtain assistance from authorities in the State of transit in maintaining custody.

(5) The Party to which the person has been extradited shall reimburse the Party through whose territory such person is transported for any expenses incurred by the latter in connection with such transportation.

ARTICLE XX

This Treaty applies to offenses mentioned in Article II committed before, on or after the date on which this Treaty enters into force, provided that no extradition shall be granted for an offense committed before that date which was not an offense under the laws of both Contracting Parties at the time of its commission.

ARTICLE XXI

(1) This Treaty is subject to ratification and the instruments of ratification shall be exchanged in Canberra as soon as possible.

(2) This Treaty shall enter into force thirty days after the exchange of instruments of ratification. [1]

(3) This Treaty may be terminated by either Contracting Party giving notice of termination to the other Contracting Party at any time and the termination shall be effective six months after the date of receipt of such notice.

(4) This Treaty shall terminate and replace, as between the Contracting Parties to the present Treaty, the Treaty on Extradition between the United States and Great Britain of December 22, 1931, [2] as made applicable to Australia.

---

[1] May 8, 1976.
[2] TS 849; 47 Stat. 2122.

EX-DION-000023

18

IN WITNESS WHEREOF the undersigned, being duly authorized thereto by their respective Governments, have signed this Treaty.

DONE at Washington this fourteenth day of May, 1974.

FOR THE UNITED STATES OF AMERICA:

*Kenneth Rush*

FOR AUSTRALIA:

*Patrick Shaw*

U.S. GOVERNMENT PRINTING OFFICE: 1974    O—73-829

EX-DION-000024

| 102D CONGRESS<br>2d Session | SENATE | TREATY DOC.<br>102-23 |

# PROTOCOL AMENDING THE 1974 EXTRADITION TREATY WITH AUSTRALIA

---

## MESSAGE

FROM

# THE PRESIDENT OF THE UNITED STATES

TRANSMITTING

THE PROTOCOL AMENDING THE TREATY ON EXTRADITION BE-
TWEEN THE UNITED STATES OF AMERICA AND AUSTRALIA,
SIGNED AT SEOUL ON SEPTEMBER 4, 1990

Entered into Force December 21, 1992



FEBRUARY 19, 1992.—Protocol was read the first time, and together with
the accompanying papers, referred to the Committee on Foreign Rela-
tions and ordered to be printed for the use of the Senate

U.S. GOVERNMENT PRINTING OFFICE
WASHINGTON : 1992

59-118

EX-DION-000025

# LETTER OF TRANSMITTAL

---

THE WHITE HOUSE, *February 19, 1992.*

*To the Senate of the United States:*

With a view to receiving the advice and consent of the Senate to ratification, I transmit herewith the Protocol Amending the Treaty on Extradition between the United States of America and Australia, signed at Seoul on September 4, 1990. I also transmit for the information of the Senate the report of the Department of State with respect to the Protocol.

The Protocol supplements and amends the Treaty on Extradition between the United States of America and Australia, signed at Washington on May 14, 1974. It is designed to update and standardize the conditions and procedures for extradition between the United States and Australia. Most significant, it removes an outdated list of extraditable offenses from the 1974 Treaty and expands upon the dual criminality approach contained in that Treaty. The Protocol also provides a legal basis for temporarily surrendering prisoners to stand trial for crimes against the laws of the requesting State. The provisions in this Protocol follow generally the form and content of extradition treaties recently concluded by the United States.

This Protocol will make a significant contribution to international cooperation in law enforcement. I recommend that the Senate give early and favorable consideration to the Protocol and give its advice and consent to ratification.

GEORGE BUSH.

(III)

EX-DION-000026

# LETTER OF SUBMITTAL

DEPARTMENT OF STATE,
*Washington, February 13, 1992.*

The PRESIDENT,
*The White House.*

THE PRESIDENT: I have the honor to submit to you the Protocol Amending the Treaty on Extradition between the United States of America and Australia, signed at Seoul on September 4, 1990. I recommend that this Protocol be transmitted to the Senate for its advice and consent to ratification.

The provisions of this Protocol follow generally the form and content of extradition treaties recently concluded by the United States. It represents a concerted effort by the Department of State and the Department of Justice to modernize the legal tools available for the extradition of serious offenders such as narcotics traffickers and terrorists.

Upon entry into force, this Protocol will supplement and amend the 1974 Treaty on Extradition between the United States of America and Australia, signed at Washington on May 14, 1974.

Article 1 of the Protocol replaces Article II of the 1974 Treaty in its entirety. It rearticulates the dual criminality approach contained in the 1974 Treaty which is used to determine whether a particular offense is extraditable and eliminates the outdated list of extraditable offenses contained in the 1974 Treaty. This modern extradition practice emphasizes extradition based on underlying criminal conduct rather than the particular designation of the offense contained in our respective criminal codes. A dual criminality clause permits extradition for any conduct that is punishable in both States by imprisonment or other detention for at least one year. Inclusion of a dual criminality clause obviates the need to renegotiate or supplement the Treaty as offenses, such as computer-related crimes or money laundering, become punishable under the laws of both States.

Article 1 of the Protocol also requires extradition for conspiring, attempting or participating in the commission of an offense under the Treaty, as amended.

An offense is extraditable under Article 1 of the Protocol, notwithstanding any interstate transportation or mail-use elements required to establish U.S. Federal jurisdiction. This provision will allow the United States to obtain extradition for such offenses even though Australian law does not include analogous jurisdictional elements for similar underlying criminal behavior.

Article 1 further requires extradition for extraterritorial offenses so long as the law of the requested State would provide for extra-

(V)

territorial jurisdiction under similar circumstances. The requested State is also given the discretion to grant extradition for extraterritorial offenses in all other cases.

Article 2 of the Protocol deletes Articles III and IV of the 1974 Treaty concerning territorial jurisdiction which is now covered in more general terms under Article I of the Protocol.

Article 3 of the Protocol replaces Article V(2) of the 1974 Treaty. The Article, as amended, would continue to permit the requested State to grant or deny extradition of its nationals but, in cases where extradition is denied, would provide a mechanism for the requesting State to require submission to prosecution by the requested State, to the extent permitted by its laws, of all offenses for which extradition has been sought.

Article 4 of the Protocol deletes Article VI of the 1974 Treaty concerning the standard of proof required to support extradition. This concept is now covered by Article 7 of the Protocol.

Article 5 of the Protocol replaces Article VIII of the 1974 Treaty and permits the requested State to deny extradition for a capital offense, if the requesting State fails to provide sufficient assurance that the death penalty will not be imposed or carried out.

Article 6 of the Protocol replaces Article IX of the 1974 Treaty. It allows the requested State to postpone extradition proceedings or surrender if the fugitive who is the subject of an extradition request is being prosecuted or is serving a sentence in the requested State. Under this provision the requested State has the discretion to grant extradition and surrender the fugitive temporarily to the requesting State for the purpose of early prosecution in that State. This provision will allow a person serving a long sentence in the requested State to be tried promptly in the requesting State and returned to the requested State to complete his sentence. This alternative of temporary surrender is routinely included in our modern extradition treaties.

Article 7 replaces Article XI of the 1974 Treaty and specifies the procedures by which extradition is to be accomplished. The procedures provided therein are similar to those found in other modern extradition treaties.

Articles 8 replaces Article XII of the 1974 Treaty. It provides for the provisional arrest and detention of a fugitive for no more than 60 days pending receipt of a fully documented extradition request in conformance with Article XI of the Treaty, as amended. The discharge of a fugitive from custody does not prejudice subsequent rearrest and extradition upon later receipt of the extradition request and supporting documents.

Article 9 of the Protocol supplements and amends Article XIII of the 1974 Treaty. It continues the mechanism for the submission of additional information whenever the requested State considers the information provided with the request to be insufficient. Article XIII, as amended, would also permit expedited surrender without formal proceedings where the person sought consents to surrender after having been advised by the competent authority of his or her right to formal extradition proceedings.

Article 10 replaces Article XIV of the 1974 Treaty concerning the rule of speciality. This article provides, subject to specific exceptions, that a person extradited under the Treaty, as amended, may

EX-DION-000028

VII

not be detained, tried, or punished for an offense other than that for which extradition has been granted without the consent of the requested State; nor may he be extradited without the consent of the requested State to a third State for any offense committed before his surrender. This limitation only applies until such time as the person leaves the territory of the requesting State and voluntarily returns or fails to leave within 15 days of being free to do so.

Article 11 of the Protocol replaces Article XV of the 1974 Treaty and sets forth a non-exclusive list of factors to be considered by the requested State in determining to which State to surrender a person sought by more than one State.

Article 12 of the Protocol replaces Article XVI of the 1974 Treaty. It requires the requested State to notify the requesting State promptly of its decision on extradition and, if it denies extradition, in whole or in part, to provide an explanation as well as copies of judicial decisions upon request. If extradition is granted, the fugitive must be removed from the territory of the requested State within the time prescribed by the law of the requested State, or the person may be released from custody and a subsequent request for his extradition may be refused.

Article 13 of the Protocol replaces Article XVII of the 1974 Treaty and provides for the seizure and ultimate surrender to the requesting State of all items connected with the offense for which extradition is sought. This obligation is subject to the rights of third parties. Before surrender, the requested State may require assurances that the objects be returned.

Article 14 of the Protocol replaces the text of Article XVIII of the 1974 Treaty and provides that the requested State shall represent the requesting State in any proceedings in the requested State arising from a request for extradition and bear all costs other than those arising from the translation of documents and transportation of the fugitive.

Article 15 replaces Article XIX of the 1974 Treaty and governs the transit through the territory of one of the contracting States of a person being surrendered to the other contracting State by a third State.

Article 16 of the Protocol stipulates that the Protocol applies to offenses committed before as well as after its entry into force.

Article 17 provides that the Protocol will enter into force immediately upon the exchange of written notification that both Parties have complied with their respective requirements for entry into force.

A Technical Analysis explaining in detail the provisions of the Protocol is being prepared by the United States negotiating delegation, consisting of representatives from the Departments of Justice and State, and will be transmitted separately to the Senate Committee on Foreign Relations.

The Department of Justice joins the Department of State in favoring approval of this Protocol by the Senate at an early date.

Respectfully submitted,

LAWRENCE S. EAGLEBURGER.

PROTOCOL AMENDING THE TREATY ON EXTRADITION BETWEEN
THE UNITED STATES OF AMERICA
AND
AUSTRALIA
OF MAY 14, 1974

The United States of America and Australia;

Desiring to make more effective the Extradition Treaty between
the Contracting Parties signed at Washington May 14, 1974
(hereinafter referred to as "the Treaty");

Have agreed as follows:

(1)

EX-DION-000030

## ARTICLE 1

The text of Article II of the Treaty is replaced by the
following:

"(1)  An offence shall be an extraditable offence if it is
punishable under the laws in both Contracting Parties by
deprivation of liberty of more than one year, or by a more
severe penalty.  However, if the request for extradition
relates to a person convicted of such an offence who is
wanted for the enforcement of a sentence of imprisonment,
the executive authority of the requested State shall have
authority to refuse extradition if a period of less than
six months of imprisonment remains to be served.

(2)  The following offences shall be extraditable if they
meet the requirements of paragraph (1): conspiring to
commit, attempting to commit, aiding or abetting,
counselling or procuring the commission of, or being an
accessory after the fact to, any offence described in that
paragraph.

(3)  For the purpose of this Article, an offence shall be
an extraditable offence:

    (a) whether or not the laws in the Contracting
    Parties place the offence within the same
    category of offences or describe the offence by
    the same terminology; and

EX-DION-000031

(b) whether or not the offence is one for which United States federal law requires proof of interstate transportation, or use of the mails, or of other facilities affecting interstate or foreign commerce, such matters being merely for the purpose of establishing jurisdiction in a United States federal court.

(4) If the offence has been committed outside the territory of the requesting State, extradition shall be granted if the laws in the requested State provide for the punishment of an offence committed outside of its territory in similar circumstances. If the laws in the requested State do not so provide, the executive authority of the requested State may, in its discretion, grant extradition.

(5) Subject to the laws in the requested State, if extradition has been granted for an extraditable offence, it shall also be granted for any other offence specified in the request even if the latter offence is punishable by deprivation of liberty of one year or less, provided that all other requirements of extradition are met."

ARTICLE 2

Article III and Article IV of the Treaty are deleted.

### ARTICLE 3

The text of paragraph 2 of Article V of the Treaty is replaced by the following:

"If the requested State refuses to extradite a national of that State on the basis of nationality it shall, if the requesting State so requests and the laws of the requested State allow, submit the case to the competent authorities in order that proceedings for the prosecution of the person may be undertaken in respect of all offences for which the extradition has been requested."

### ARTICLE 4

Article VI of the Treaty is deleted.

### ARTICLE 5

The text of Article VIII of the Treaty is replaced by the following:

"If, under the law of the requesting State, an offence for which the extradition of a person is requested is subject to a

penalty of death, the requested State may refuse the
extradition unless the requesting State gives an undertaking
that the death penalty will not he imposed or, if imposed, will
not be carried out."


ARTICLE 6


The text of Article IX of the Treaty is replaced by the
following:

"(1) If the extradition request is granted in the case of a
person who is being prosecuted or is serving a sentence in
the territory of the requested State, the requested State
may temporarily surrender the person sought to the
requesting State for the purpose of prosecution. The
person so surrendered shall be kept in custody in the
requesting State and shall be returned to the requested
State after the conclusion of the proceedings against that
person, in accordance with conditions to be mutually
determined in writing between the Contracting Parties.
(2) The requested State may postpone the extradition
proceedings against, or the surrender of, any person who is
being prosecuted or who is serving a sentence in that

State. The postponement may continue until the prosecution of
the person sought has been concluded and any sentence has been
served."

### ARTICLE 7

The text of Article XI of the Treaty is replaced by the
following:

"(1) All requests for extradition shall be made through
the diplomatic channel.

(2) The request for extradition shall be supported by:

(a) documents, statements, or other types of
information which describe the identity and
probable location of the person sought;

(b) a description of the conduct constituting the
offence;

(c) a statement of the law describing the
essential elements of the offence for which
extradition is requested; and

(d) a statement of the law describing the
punishment for the offence and the law relating
to the limitation of legal proceedings.

(3) A request for the extradition of a person who is
sought for prosecution or who has been found guilty in his
absence shall also be supported by:

7

- 7 -

(a) a copy of the warrant or order of arrest
issued in the requesting State for the arrest of
the person for the offence;

(b) a copy of the charging document, if any; and

(c) a description of the facts, by way of
affidavit, statement, or declaration, setting
forth reasonable grounds for believing that an
offence has been committed and that the person
sought committed it.

(4) A request for extradition of a person who has been
found guilty of the offence for which extradition is
sought, other than a person who has been found guilty in
his absence, shall also be supported by:

(a) a copy of the judgment of conviction, if
available, or a statement by a judicial authority
that the person has been found guilty;

(b) information establishing that the person
sought is the person to whom the finding of guilt
refers;

(c) a copy of the sentence imposed, if the person
has been sentenced, and a statement establishing
to what extent the sentence has been carried out;
and

(d) if the person has been found guilty but no
sentence has been imposed, a statement affirming
that it is intended to impose a sentence.

- 8 -

(5) The documents which accompany an extradition request shall be received and admitted as evidence in extradition proceedings if:

    (a) in the case of a request from the United States, they

        (i) purport to be signed or certified by a judge, magistrate, or officer in or of the United States; and

        (ii) purport to be authenticated by the oath or affirmation of a witness or to be sealed with an official or public seal of the requesting State or of a Minister of State, or of a Department or officer of the Government of the requesting State;

    (b) in the case of a request from Australia, they are certified by the principal diplomatic or consular officer of the United States resident in Australia, as provided by the extradition laws of the United States; or

    (c) they are certified or authenticated in any other manner accepted by the law of the requested State."


ARTICLE 8

The text of Article XII of the Treaty is replaced by the following:

"(1)  In case of urgency, either Contracting Party may request the provisional arrest of the person sought pending presentation of the request for extradition. A request for provisional arrest may be transmitted through the diplomatic channel or directly between the Department of Justice in the United States and the Attorney-General's Department in Australia. The facilities of the International Criminal Police Organisation (Interpol) may be used to transmit such a request.

(2)  The application for provisional arrest shall contain:

        (a) a description of the person sought;

        (b) the location of the person sought, if known;

        (c) a brief statement of the facts of the case, including, if possible, the time and location of the offence;

        (d) a description of the laws violated or alleged to have been violated and, where applicable, the penalty which may be imposed;

        (e) a statement of the existence of a warrant of arrest or finding of guilt or judgment of conviction against the person sought; and

        (f) a statement that a request for the extradition of the person sought will follow.

(3)  On receipt of the application, the requested State shall take appropriate steps to secure the arrest of the person sought. The requesting State shall be notified

- 10 -

without delay of the disposition of its application and the reasons for any denial.

(4) A person who is provisionally arrested may be discharged from custody upon the expiration of sixty (60) days from the date of arrest pursuant to the application of the requesting State if the executive authority of the requested State has not received the formal request for extradition and the supporting documents required in Article XI.

(5) The fact that the person sought has been discharged from custody pursuant to paragraph (4) of this Article shall not prejudice the subsequent rearrest and extradition of that person if the extradition request and supporting documents are received at a later date."

ARTICLE 9

Article XIII of the Treaty is amended by deleting the words "evidence or" wherever they occur in Article XIII(1) and Article XIII(2), and by adding the following:

"(4) If the person sought, after being personally advised by the competent authority of the requested State of his right to formal extradition proceedings, consents to

surrender to the requesting State, the requested State may
surrender the person as expeditiously as possible and
without further proceedings."

ARTICLE 10

The text of Article XIV of the Treaty is replaced by the
following:

"(1)  A person extradited under this Treaty may not be
detained, tried, or punished in the requesting State except
for:

(a) the offence for which extradition is granted
or any other offence of which the person could be
convicted on proof of the conduct constituting
the extradition offence provided that the offence
carries the same or a lesser punishment;

(b) any offence committed after the extradition;
or

(c) any offence for which the executive authority
of the requested State consents to the person's
detention, trial or punishment.  For the purposes
of this subparagraph, the requested State may
require the submission of the documents specified
in Article XI.

(2)  A person extradited under this Treaty by a Contracting
Party may not be extradited to a third State for an offence

- 12 -

committed prior to his surrender unless that Contracting
Party consents.

(3)  Paragraphs (1) and (2) of this Article shall not
prevent the detention, trial, or punishment of an
extradited person, or the extradition of that person to a
third State, if:

> (a) that person leaves the territory of the
> requesting State after extradition and
> voluntarily returns to it; or

> (b) that person does not leave the territory of
> the requesting State within fifteen days of the
> day on which the person is free to do so."

## ARTICLE 11

The text of Article XV of the Treaty is replaced by the
following:

"If the requested State receives requests from the other
Contracting Party and from any other State or States for the
extradition of the same person, either for the same offence or
for a different offence, the executive authority of the
requested State shall determine to which State it will surrender
the person.  In making its decision, the requested State shall
consider all relevant factors, including but not limited to:

(a) whether the requests were made pursuant to treaty;

(b) the place where each offence was committed;

(c) the respective interests of the requesting States;

(d) the gravity of the offences;

(e) the nationality of the victim;

(f) the possibility of further extradition between the requesting States; and

(g) the chronological order in which the requests were received from the requesting States."


## ARTICLE 12

The text of Article XVI of the Treaty is replaced by the following:

"(1) The requested State shall promptly notify the requesting State of its decision on the request for extradition.

(2) If the request is denied in whole or in part, the requested State shall provide information as to the reasons for the denial of the request. The requested State shall provide copies of pertinent judicial decisions on request.

(3) If the request for extradition is granted, the competent authorities of the Contracting Parties shall arrange for the time and place of the surrender of the person sought.

(4) If the person sought is not removed from the territory of the requested State within the time prescribed by the law of that State, that person may be discharged from

14

- 14 -

custody, and the requested State may subsequently refuse
extradition for the same offences."


ARTICLE 13

The text of Article XVII of the Treaty is replaced by the
following:

"(1) To the extent permitted under its laws, the requested
State may seize all articles, documents, and evidence
connected with the offence in respect to which extradition
is or is to be sought and surrender those items to the
requesting State if extradition is subsequently granted.
The items mentioned in this Article may be surrendered even
when extradition cannot be effected due to the death,
disappearance, or escape of the person sought.

(2) The requested State may require that the surrender of
any property be subject to satisfactory assurances from the
requesting State that the property will be returned to the
requested State as soon as practicable. The requested
State may also defer surrender of any property if it is
needed as evidence in the requested State.

(3) The rights of third parties in any property shall be
duly respected."

### ARTICLE 14

The text of Article XVIII of the Treaty is replaced by the following:

"(1)  The requested State shall advise, assist, and otherwise represent the interests of the requesting State in any proceedings arising out of a request for extradition.

(2)  The requesting State shall bear the expenses related to any translation of documents and the transportation of the person surrendered.  The requested State shall pay all other expenses incurred in that State by reason of the extradition proceedings.

(3)  Neither State shall make any pecuniary claim against the other arising out of the arrest, detention, examination, or surrender of the person sought under this Treaty."

### ARTICLE 15

The text of Article XIX of the Treaty is replaced by the following:

"(1)  Either Contracting Party may authorise transportation through its territory of a person surrendered to the other State by a third State. A request for transit shall contain a description of the person being transported and a brief

statement of the facts of the case. A person in
transit shall be held in custody during the
period of transit.

(2) No authorisation is required where air
transportation is used and no landing is
scheduled on the territory of the other
Contracting Party. If an unscheduled landing
occurs on the territory of the other Contracting
Party, the other Contracting Party may require
the request for transit as provided in paragraph
1. That Contracting Party shall detain the
person being transported until the request for
transit is received and the transit is effected,
so long as the request is received within 96
hours of the unscheduled landing."

### ARTICLE 16

Notwithstanding Article XX of the Treaty, this Protocol shall
apply in all cases in which the request for extradition is made
after its entry into force regardless of whether the offence
was committed before or after that date.

- 17 -

### ARTICLE 17

This Protocol shall enter into force on the date on which the Contracting Parties have exchanged written notification that they have complied with their respective requirements for the entry into force of this Protocol.

IN WITNESS WHEREOF, the undersigned, being duly authorised thereto by their respective Governments, have signed this Protocol.

DONE at Seoul, this 4th day of September, 1990

FOR THE UNITED STATES OF AMERICA:

FOR AUSTRALIA:

IN WITNESS WHEREOF the undersigned, being duly authorized thereto by their respective Governments, have signed this Treaty.

DONE at Washington this fourteenth day of May, 1974.

FOR THE UNITED STATES OF AMERICA:

*Kenneth Rush*

FOR AUSTRALIA:

*Patrick Shaw*

TIAS 8234

U.S. GOVERNMENT PRINTING OFFICE : 1974 O—73-629

**Certificate to be Attached to Documentary Evidence Accompanying
Requisitions in the United States of America for Extradition**

## AMERICAN FOREIGN SERVICE

Canberra, Australia, October 23, 2018

I, James Carouso, Chargé d'Affaires of the Embassy of the United States of America at
[C]anberra, Australia hereby certify that the annexed papers, being official documents provided by
[the G]overnment of Australia proposed to be used upon an application for the extradition from the
[Uni]ted States of America of Alex Dion (also known as Ahmad Arnaout), charged with the crime of
[mu]rder contrary to paragraph 18(1)(a) of the *Crimes Act 1900* (NSW), alleged to have been
[co]mmitted in Australia in May 2018, are properly and legally authenticated so as to entitle them to
[be] received in evidence for similar purposes by the tribunals of Australia, as required by Title 18,
[U]nited States Code, Section 3190.

In witness whereof I hereunto sign my name and cause my seal of office to be affixed
this 23rd day of October, 2018.

James Carouso
Chargé d'Affaires

Embassy of the United States of America



I, Karen Moore, Assistant Secretary of the International Crime Cooperation Central Authority, International Division, Attorney-General's Department, an officer in and of the Commonwealth of Australia, hereby certify that the documents attached to this certificate relate to the request for extradition from the United States of America to the Commonwealth of Australia of Alex Dion (also known as Ahmad Arnaout)

AND

I further certify that the seal affixed to this certificate is the seal of the Attorney-General of the Commonwealth of Australia, who is a Minister of State of the Commonwealth of Australia

AND

I further certify that the above-mentioned seal of the Attorney-General authenticates everything attached to this certificate.

Given under my hand and the official seal of the Attorney-General of the Commonwealth of Australia affixed to the tape binding all the attached documents.



Karen Moore
Assistant Secretary
International Crime Cooperation Central Authority
International Division
Attorney-General's Department
an officer in and of the Commonwealth of Australia



## REQUEST FOR THE EXTRADITION TO AUSTRALIA OF
## ALEX DION (ALSO KNOWN AS AHMAD ARNAOUT)
## FROM THE UNITED STATES OF AMERICA

I, the Honourable Christian Porter MP, Attorney-General, a Minister of State of the Commonwealth of Australia, on behalf of the Government of Australia, hereby request that Alex Dion (also known as Ahmad Arnaout), who is accused in New South Wales, a State of the Commonwealth of Australia, of the following offence:

- one offence of murder contrary to section 18(1)(a) of the *Crimes Act 1900* (New South Wales)

be returned to Australia to be dealt with according to law.

Dated this 15th day of October 2018

THE HON CHRISTIAN PORTER MP
ATTORNEY-GENERAL



IN THE MATTER OF THE REQUEST

FOR THE EXTRADITION OF

ALEX DION (ALSO KNOWN AS AHMAD ARNAOUT)

FROM THE UNITED STATES OF AMERICA

TO AUSTRALIA

## AFFIDAVIT OF POLICE INVESTIGATOR

### Introduction

On Wednesday 3 October 2018, I, Detective Sergeant Richard Michael HOWE, of 1 Charles Street, Parramatta, in New South Wales (NSW) make oath and say:

1.  I am a Detective Sergeant employed by the NSW Police Force and currently attached to the Homicide Squad, State Crime Command.

2.  I am the Officer in Charge of an investigation named Strike Force "Sinder" that was established to investigate the offence allegedly committed by Alex DION (DION) referred to below.

3.  I joined the NSW Police Force in 2002. Since then I have been involved in numerous investigations into offences against laws of the State of NSW. I have five years experience in investigating homicide offences. During this period I have also been responsible for the preparation of numerous briefs of evidence for the prosecution of such offences by the Office of the Director of Public Prosecutions for NSW.

4.  'Alex' is the given name of the person whose surrender is sought and 'DION' is his family name. That person is hereafter referred to as 'DION'.

### Offence for which surrender is sought

5.  DION is accused of committing the following offence ('the offence'):

    (a)  murder, contrary to paragraph 18(1)(a) of the *Crimes Act 1900* (NSW) (Crimes Act).

Magistrate..................    Deponent..................

6. The maximum penalty applicable for the offence of murder is: life imprisonment.

7. On 11 September 2018 an arrest warrant was issued in respect of DION by the Local Court of NSW at Parramatta. A copy of the original arrest warrant is annexed to the affidavit sworn on 2 October 2018 by Diana Paterson, Solicitor, Office of the Director of Public Prosecutions (NSW), 175 Liverpool Street, Sydney, NSW 2000.

**Summary of the acts and omissions alleged against DION in respect of the offence**

8. Between Friday 25 May 2018 and Sunday 27 May 2018 DION murdered Wachira PHETMANG by inflicting over 20 wounds to PHETMANG'S head resulting in fatal head injuries. DION disposed of PHETMANG'S body in bush adjacent to Homebush Bay Drive in Sydney Olympic Park in Sydney and later disposed of certain items of PHETMANG'S clothing and possessions at a building site in East Killara in Sydney. DION departed Australia for the United States of America (US) on 27 May 2018 in possession of PHETMANG'S mobile phones and credit cards.

**Detailed statement of the acts and omissions alleged against DION in respect of the offence**

*Discovery of PHETMANG'S body*

9. At the time of his death on approximately 25 May 2018 PHETMANG was a 33-year old Thai national who resided in Railway Parade, Hurstville, NSW with his partner, Karn MANEESURIYA. Immigration records show that PHETMANG first came to Australia in 2000 and that at the time of his death he was a permanent resident in Australia. NSW Police Force believes that PHETMANG smoked methamphetamine and that he frequently purchased methamphetamine in small quantities to share with, and supply to, associates. The NSW Police Force investigation has revealed that PHETMANG owned two mobile telephones, a Samsung Galaxy S8 Mobile phone (with the International Mobile Equipment Identity (IMEI) 35912208780040 and phone number 0410 919 594) and an Apple iPhone X (with the IMEI 35305709429143 and phone number 0425 699 880).

Magistrate.....................

Deponent.....................

10. On Wednesday 6 June 2018 a passing truck driver noticed PHETMANG'S body in bushland adjacent to Homebush Bay Drive near Sydney Olympic Park in Sydney. PHETMANG'S body was wrapped in black Corflute plastic sheeting, tied with white rope. Corflute sheeting is used by tradespersons, including tilers, to protect floor tiles from damage. Torn T-shirt material was tied around PHETMANG'S wrists and ankles as well as placed inside his mouth. No mobile telephone, wallet or shoes were found on PHETMANG'S body, but a black, size 12 US men's Dewalt work boot was found under the Corflute sheeting.

11. NSW Police Force inquiries have established that PHETMANG'S family and friends have not seen him since 25 May 2018. PHETMANG'S sister, Walapha TANGWATANKHIT, reported him missing on 3 June 2018. A post mortem examination of PHETMANG'S body identified in excess of 20 wounds to PHETMANG'S head and a number of skull fractures. PHETMANG'S nose and one of his thumbs were fractured. The forensic pathologist who examined PHETMANG'S body gave the interim cause of death as 'head injuries' and indicated that PHETMANG'S body may have been on the side of the road for a number of days prior to discovery.

*Evidence of events on 24 and 25 May 2018, prior to PHETMANG'S murder*

12. The NSW Police Force investigation has revealed that during the afternoon of Thursday 24 May 2018 Farhad GHAHREMANI, an associate of PHETMANG, deposited AUD350 into PHETMANG'S Commonwealth Bank of Australia Smart Access Account with the account number 16933493, via an automatic teller machine at Guildford in Sydney. NSW Police Force believes that this money was payment for a small quantity of methamphetamine. At 9.46pm on 24 May 2018 PHETMANG withdrew this money and at approximately 11.05pm arrived at Mr B's Hotel in Pitt Street, Sydney. There PHETMANG spoke to an associate and stated that PHETMANG was at Mr B's Hotel to meet a friend. NSW Police Force believes that PHETMANG then obtained a small quantity of methamphetamine before travelling by train to Guildford where he met GHAHREMANI, arriving at GHAHREMANI'S residence at 26 Salisbury Road, Guildford at approximately 12.59am on 25 May 2018. PHETMANG remained at GHAHREMANI'S residence until 2.30am when he travelled via Uber to his unit at Hurstville. GHAHREMANI has informed

Magistrate...................... Deponent..................

NSW Police Force that he did not see PHETMANG again after PHETMANG left GHAHREMANI'S residence.

13. Upon his return to his residence at Hurstville, PHETMANG told MANEESURIYA that there had been an argument with 'the Iranian' as there was something missing from 'the package' and that half a gram of methamphetamine was missing. NSW Police Force believes that PHETMANG'S reference to 'the Iranian' is a reference to Ghahremani, who is of Iranian descent. At about 12.30pm on the afternoon of Friday 25 May 2018 PHETMANG left his Hurstville residence, telling MANEESURIYA that he was going to St Vincent's Hospital and then to see someone in the city to obtain the missing portion of the methamphetamine. PHETMANG travelled to the city and during the course of the afternoon of 25 May 2018 asked his sister, TANGWATANKHIT, for money, promising to return the money later that evening. On the afternoon of 25 May TANGWATANKHIT transferred AUD200 to PHETMANG'S account and later on that day also transferred a further AUD400 to PHETMANG'S account.

14. From about 9.50am onwards on Friday 25 May PHETMANG was in mobile phone contact with DION and at about 7.00pm on that day PHETMANG met with DION in Hurstville. The purpose of this meeting was for PHETMANG to supply DION with methamphetamines.

15. At about 7.30pm PHETMANG and DION travelled in DION'S 2004 silver Hyundai Terracan bearing Victorian registration plates URK109 to a 7-Eleven convenience store at 822 King Georges Road, South Hurstville. PHETMANG and DION entered the store where DION tried to use the automatic teller machine. According to closed circuit television (CCTV) footage obtained by NSW Police Force, PHETMANG was wearing a 'Captain America' baseball cap, a navy coloured jacket with a hood, a white and blue horizontal striped T-shirt, beige pants and red basketball boots. PHETMANG had a brown satchel hanging from his neck. DION was wearing a blue T-shirt with a distinctive white motif on the front and grey stained work pants. The T-shirt that DION was wearing matches the T-shirt that was used to bind PHETMANG'S wrists. A photo of Dion wearing this T-shirt is annexed to this affidavit and marked 'A'. A further photo of the T-shirt after it was retrieved by NSW Police Force and pieced back together is also annexed to this affidavit

Magistrate...................

Deponent...................

and marked **'B'**. At about 7.38pm on 25 May 2018 PHETMANG and DION left the 7-Eleven store in DION'S vehicle. This was the last time that NSW Police Force has seen PHETMANG on CCTV footage.

16. NSW Police Force's investigation has revealed that PHETMANG had a Google account, on which he recorded his movements through his mobile telephone. On 1 June 2018, following an inquiry about PHETMANG'S whereabouts from Juthamas THIENGCHUTTI (one of PHETMANG'S flatmates), Pattharasett RATCHATATHUANUPONG (a former partner of PHETMANG) accessed PHETMANG'S Google account from Thailand using an iPad that RATCHATATHUANUPONG had previously shared with PHETMANG when they were living together in Sydney. On 1 June 2018 RATCHATATHUANUPONG took three screenshot images of a journey that was recorded on PHETMANG'S Google 'timeline' on 25 May 2018. This journey commenced near PHETMANG'S apartment in Hurstville at 7.10pm, from where he travelled to the 7-Eleven store in South Hurstville, arriving at 7.27pm. PHETMANG'S Google 'timeline' then recorded a journey from the 7-Eleven store, departing at 7.38pm, to a location near Leylands Parade in Belmore, Sydney, arriving at about 8.11pm. DION resided in a unit at 15/473 Burwood Road, Belmore (the Belmore unit), about 100 metres from Leylands Parade. Copies of these three screen shots are annexed to this affidavit and marked **'C'**.

17. On 1 June 2018 RATCHATATHUANUPONG forwarded these screenshots by email to PHETMANG'S sister, TANGWATANKHIT, who supplied them to NSW Police Force. NSW Police Force believes that after 9 June 2018 RATCHATATHUANUPONG was no longer able to access PHETMANG'S Google account.

18. At about 11.02pm on Friday 25 May 2018 Pichet LAOWONGKOT, an associate of PHETMANG, received a telephone call from PHETMANG'S Samsung mobile telephone. LAOWONGKOT answered the call but could not hear anyone. At about the same time LAOWONGKOT received a text message from PHETMANG'S Samsung mobile telephone which read, '[C]an I call you back later?'. LAOWONGKOT described the use of English rather than Thai in the text message as unusual. LAOWONGKOT'S further attempts to contact PHETMANG were unsuccessful. Telephone records indicate that at

Magistrate.......................  Deponent.......................

around this time PHETMANG'S Samsung mobile telephone activated a cell tower in the Beverley Hills or Kingsgrove areas of Sydney. NSW Police Force suspects that DION had PHETMANG'S mobile phone and sent the phone messages to LAOWONGKOT.

19. At about 11.05pm on 25 May Adib EL-ANANI, DION'S associate, employer and flatmate, received a number of text messages from PHETMANG'S Samsung mobile telephone, offering to supply EL-ANANI methamphetamines and indicating that PHETMANG was in the Kingsgrove area. EL-ANANI did not reply to these messages and later indicated that he was asleep (call charge records tend to confirm EL-ANANI'S account of these text messages). From this time onwards, all calls and messages to PHETMANG from family and associates appear to have been unanswered. It remains unknown exactly when and where PHETMANG was murdered.

*DION'S movements in Australia on 27 May 2018*

20. At approximately 5.45am on Sunday 27 May 2018 DION's mobile phone was captured at cell towers in the Homebush Bay area, in close proximity to where the body of PHETMANG was later located.

21. At about 6.24am on Sunday 27 May 2018 DION'S mobile telephone (with the number 0416 077 198) activated cell towers in the East Killara area in Sydney. DION'S mobile phone remained in this area until about 12.28pm, before returning to the Belmore unit. Consistent with this information, at about 6.47am on the same day a vehicle matching DION'S vehicle was captured on CCTV footage travelling on Savoy Avenue in East Killara.

22. At about 12.28pm on 27 May 2018 DION dialled the emergency number '000' using his mobile telephone and spoke to a police operator. DION identified himself by name, stating he was a US citizen who was in Sydney visiting an unnamed friend who was a drug user. DION stated that he had sought help for his friend however the 'drug dealer' had found this out and telephoned DION, abusing him. The operator at the emergency call centre encouraged DION to accept a visit from police, but shortly afterwards DION terminated the phone call and the emergency centre could make no further contact with

Magistrate...................

Deponent...................

DION. Telephone records obtained by NSW Police Force indicate that at the time of this call DION was at East Killara.

23. The NSW Police Force investigation indicates that after leaving East Killara, DION returned to the Belmore unit where he used a high-pressure water cleaner and cleaning products to wash the interior of the Hyundai vehicle in the underground car wash bay of the unit complex. This high-pressure cleaner was later returned to the unit.

24. At approximately 3.00pm on 27 May 2018 DION contacted Siad BEYROUTIEH, for whom he had previously performed one day's labour, via mobile phone. During this phone call, DION requested AUD200 from BEYROUTIEH and at about 4.00pm went to BEYROUTIEH'S house in DION'S Hyundai vehicle to collect the money. While DION was at BEYROUTHIEH'S house, DION told BEYROUTHIEH that he was leaving for the US and could not stay with EL-ANANI due to EL-ANANI'S drug use. DION asked BEYROUTHIEH to drive him to the airport in his vehicle before returning it to BELMORE. BEYROUTHIEH declined and DION left at approximately 4.15pm.

25. At about 6.00pm on 27 May 2018 DION travelled from the Belmore unit to Sydney International Airport using an Uber service and at about 9.00pm DION departed Australia on a Hawaiian Airlines flight to Honolulu. From there, he flew to San Diego, California. NSW Police Force believes these flights were purchased online on 26 May 2018.

26. NSW Police Force believes that at the time of his departure from Australia, DION was in possession of at least one of PHETMANG'S mobile telephones, PHETMANG'S Commonwealth Bank of Australia Mastercard with the number 5353 1852 8300 0454 and two St George Bank credit cards with the numbers 4239 5300 6098 1280 and 4239 5300 6078 7398. At about 8.20pm after DION had passed through the Australian customs checks at Sydney International Airport DION, purporting to be PHETMANG, sent a number of text messages using PHETMANG'S Samsung mobile telephone, in which DION invited EL-ANANI to the Hurstville area offering to sell him drugs. EL-ANANI advised NSW Police Force that as a result of these text messages

Magistrate..........................                              Deponent..........................

he went to West Street, Hurstville. PHETMANG did not arrive and
PHETMANG'S mobile telephone was turned off when EL-ANANI tried calling
it. Mobile telephone records show that both of PHETMANG'S mobile
telephones left Australia at around this time and have since been connected
to a cell site location within the US.

*Contact between DION and NSW Police Force*

27. On 20 June 2018 NSW Police Force issued a media appeal for information
relating to PHETMANG'S movements, including any sightings of DION'S
Hyundai vehicle. DION learnt about this media appeal and on 20 June 2018
contacted NSW Police Force at Burwood Police Station in Sydney from
California stating that he had seen his vehicle on the media release. DION
told NSW Police Force that EL-ANANI was possibly responsible for
PHETMANG'S murder. DION claimed he had purchased drugs from
PHETMANG but that he had purchased the drugs on EL-ANANI'S behalf and
that he went to the 7-Eleven store with PHETMANG to purchase AUD900 of
drugs for EL-ANANI. Contrary to the CCTV footage taken from the
7-Eleven store, DION stated that he contacted EL-ANANI and that EL-ANANI
went to the store and met with PHETMANG. DION claimed that DION then
left the store alone and that this was the last time he saw PHETMANG.

28. DION has since contacted NSW Police Force by telephone and email
indicating that he has information relevant to the investigation into
PHETMANG'S murder. DION has informed NSW Police Force that he was in
possession of PHETMANG'S bank cards and his mobile phone. DION
indicated that he was prepared to return to Australia but that he had no ticket
to return and was reluctant to return as he feared for his safety.

*Evidence located at the Belmore unit*

29. On Tuesday 19 June 2018 NSW Police Force executed a crime scene
warrant at the Belmore unit during which NSW Police Force conducted an
electronically recorded interview with EL-ANANI. During the interview
EL-ANANI stated that he had been an associate of DION since their
childhood, that EL-ANANI worked as a tiler and that as well as being DION'S
flatmate he had employed DION as a labourer. EL-ANANI further stated that
he was aware that DION smoked methamphetamine and that EL-ANANI had

Magistrate...............  Deponent...............

been present on two occasions with DION when he and DION purchased drugs from PHETMANG in West Street, Hurstville. EL-ANANI stated that he believed DION to be a frequent gambler who took high doses of a drug that EL-ANANI described as 'methadone'.

30.     On Monday 28 May 2018 EL-ANANI discovered that DION'S possessions were missing from the unit they had shared and that DION'S Hyundai vehicle was in the basement, not in the allocated parking space but in another position, unlocked and blocking other vehicles. The windows were down and the interior of the vehicle was saturated with water. There was black Corflute plastic inside the vehicle and the spare tyre and other items had been removed and placed in the allocated car space along with a mattress used by DION. EL-ANANI made arrangements for DION'S Hyundai vehicle to be towed to a scrap metal dealer for disposal. NSW Police Force located this vehicle and seized it before it could be disposed of.

31.     NSW Police Force conducted a forensic examination of the Belmore unit, the car wash bay and DION'S allocated car space at the Belmore unit complex, as well as both EL-ANANI'S and DION'S vehicles. A black Dewalt boot matching the boot that was found under PHETMANG'S body was located inside the Belmore unit. EL-ANANI advised police that this boot belonged to DION, who had stolen the boots some weeks prior from a Bunnings store. Sheets of black Corflute plastic identical to those that were wrapped around PHETMANG'S body were located in the car wash bay of the Belmore unit complex and also within DION'S vehicle. NSW Police Force also seized for examination cigarette butts, gloves and other items which EL-ANANI stated belonged to DION.

32.     On Wednesday 27 June 2018 NSW Police Force received information that on Monday 28 May 2018 a construction worker located clothing and items within garbage bags inside a water retention tank underneath a garage at a property under construction in Redfield Road, East Killara, Sydney. The NSW Police Force investigation indicates that DION and EL-ANANI had previously worked at this site as tilers. NSW Police Force executed a crime scene warrant at this property, in which they found a number of garbage bags containing shoes, a cap, jacket and glasses identical to those worn by PHETMANG when he was in the 7-Eleven Convenience Store on

Magistrate...................                Deponent....................

25 May 2018. NSW Police Force also found a key wallet that MANEESURIYA subsequently identified as belonging to PHETMANG. NSW Police Force also found on the property work trousers similar in appearance to those worn by DION in the CCTV footage, black coloured material similar to that located around PHETMANG'S ankles, two tyre levers, a metal bar and documents in the name of DION'S wife, Aycha EL-LON. NSW Police Force believes that these items were not at the construction site on 26 May 2018 and that DION placed them there on 27 May 2018, a belief which is consistent with the telephone records and CCTV footage mentioned above.

33. During the course of its investigation into PHETMANG'S murder, NSW Police Force conducted an analysis of DNA traces found on the following:

> (a) one of the rope bindings tied around the black Corflute plastic surrounding PHETMANG'S body

> (b) the knotted blue and white T-shirt that was tied around PHETMANG'S wrists

> (c) the wall of the car wash area in the secure underground carpark of the Belmore unit

> (d) the front passenger headrest in DION'S vehicle, and

> (e) the waist area of the trousers located in the water tank at 8 Redfield Road, East Killara.

34. An unknown male DNA profile constructed as a result of this analysis was found in close physical proximity to traces of PHETMANG'S DNA (for instance, traces of PHETMANG'S DNA and blood were located on the trousers referred to above). This same unknown male DNA profile was located on cigarette butts seized from the Belmore unit. EL-ANANI has informed NSW Police Force that these cigarette butts had belonged to DION. NSW Police Force has excluded EL-ANANI and GHAHREMANI as contributors to this DNA profile. DION'S DNA profile is not recorded on

Magistrate.....................

Deponent.....................

Australian databases. NSW Police Force strongly suspects that the unknown male DNA profile found on the above-mentioned items belongs to DION.

35. On the basis of its investigation, NSW Police Force believes that between 25 May 2018 and 27 May 2018 DION murdered PHETMANG, dumped PHETMANG'S body near Homebush Bay Drive and disposed of certain items of PHETMANG'S property in East Killara before departing Australia for the US in possession of PHETMANG'S mobile phones and credit cards.

## Nationality, physical description and identity of DION

36. DION is a citizen of the United States of America. DION is believed to have been born in Tripoli, Lebanon on 3 June 1980, and named Ahmad ARNAOUT. It is not known when DION assumed the name Alex DION.

37. DION is of a large build, about 177 to 182 centimetres tall, he weighs about 95 to 105 kilograms, has black hair and is known to wear eye glasses. DION has a fair complexion.

38. Annexed and marked 'D' is a copy of a photograph of DION taken at Sydney International Airport in the State of NSW on 27 May 2018. Australian Border Force officer Brett OLIVER extracted this photograph from CCTV footage taken at Sydney International Airport. Brett OLIVER subsequently supplied a statement to NSW Police Force that the person depicted in this photograph is the same person who cleared immigration under the name of Alex DION on 27 May 2018.

39. Annexed and marked 'E' is a copy of a photograph of DION taken in Victoria on 2 January 2015 at the time DION applied for a Victorian driver's licence. The photograph appears on DION'S driver's licence, which has the number 18982785. NSW Police Force obtained this photograph from the Victoria Police Monitoring and Assessment Centre.

40. Annexed and marked 'F' is a copy of a photograph of DION uploaded to the social media site Facebook on 11 June 2014. NSW Police Force retrieved this photograph from the Facebook page of Ahmad ARNOUT, the name given to DION at birth.

Magistrate.....................          Deponent.....................

41.  On 24 September 2018 NSW Police Force showed EL-ANANI the two images annexed to this affidavit and marked 'A' and 'D'. EL-ANANI identified the man depicted in each of these images as DION.

42.  The identification details of DION are as follows:

Name: Alex DION (also known as Ahmad ARNAOUT)

Date of Birth: 3 June 1980

Place of Birth: Lebanon

Age: 38

Nationality: US

Passport Number: 516098828

Last Known Address: 29/12345 Old Pomerado Road, POWAY, CA, 92064

**Location of DION**

43.  On 6 September 2018 DION was taken into custody in San Diego, California, as a consequence of his breaching bail conditions relating to a misdemeanour offence.

44.  Australian authorities understand that DION was arrested pursuant to Australia's provisional arrest request on 21 September 2018 and transferred into US federal custody. Australian authorities understand that, at the time of the swearing of this affidavit, he remains in federal custody in San Diego, California.

Magistrate.........................

Deponent.........................

- 13 -

I make this affidavit from information gained from my own inquiries and from information that has been made known to me by other police officers and investigators from other Australian law enforcement agencies who are or have been involved in the investigation of the offences. I believe that the information above is true and correct.

SWORN by the Deponent

at Parramatta on the

3rd day of October 2018

Deponent

Before me:

Magistrate of the State of New South Wales

T. TSANDANIDIS



Magistrate...................

Deponent...................

'A'



'B'



'C'

**[This and the following three pages constitute
annexure 'C'.]**

# 25 May 2018



**Driving**
2 km · 17 min

7:10 - 7:27 pm

Add a place          Edit



**25 May 2018**

**Driving**
8.7 km · 33 min

7:38 - 8:11 pm

Add a place                Edit

# 25 May 2018



**Driving**
8.7 km · 33 min

7:38 - 8:11 pm

Add a place      Edit

EX-DION-000069

'D'



**'E'**



Photograph Taken: 02/01/2015  Photograph Status: Valid

Requested By: V300318/A606931 - 10/06/2019 10:49:42

'F'



Ahmad Arnaout

**REQUEST FOR THE EXTRADITION OF**

**Alex DION**

**(ALSO KNOWN AS Ahmad ARNOUT)**

**FROM THE UNITED STATES OF AMERICA**

**TO THE COMMONWEALTH OF AUSTRALIA**

## AFFIDAVIT OF PROSECUTOR

On the 2nd day of October 2018, I, Diana Paterson, Solicitor, of 175 Liverpool St, Sydney in the State of New South Wales make oath and say:

1.  I am employed as a Senior Solicitor in the Office of the Director of Public Prosecutions for the State of New South Wales (NSW). NSW is a State of the Commonwealth of Australia. Subject to the direction and control of the Director, I am responsible for the prosecution of Alex Dion for the offences referred to below.

**Qualifications of the deponent**

2.  I am a qualified lawyer. I was admitted to practice as a solicitor of the Supreme Court of NSW on 6 October 2000. I hold a degree in laws from the University of Tasmania.

3.  I have been employed as a solicitor in the Office of the Director of Public Prosecutions NSW since 20 December 2004. My duties include the prosecution of persons charged with offences against the laws of the State of NSW, including but not limited to offences against the *Crimes Act* 1900 (NSW) (Crimes Act). Based on my training and experience, I am well acquainted with the provisions of the Crimes Act and other laws of the State of NSW relating to criminal law and procedure.

**OFFENCE FOR WHICH EXTRADITION IS SOUGHT**

4.  The extradition of Alex DION from the United States of America (US) to Australia is sought for prosecution of the following offence (the offence):

    a.  murder, contrary to paragraph 18(1)(a) of the Crimes Act.

5.  'Alex' is the given name of the person whose extradition is sought and 'DION' is his family name. That person is hereafter referred to as 'DION'.

**WARRANT FOR ARREST**

6.  On 11 September 2018 Registrar John Crittenden of the Local Court of NSW at Parramatta issued a warrant for the arrest of DION in respect of the offence. The warrant remains in force as at the date of this affidavit. A true copy of the warrant is annexed to this affidavit and marked **'A'**.

Magistrate ................................          Deponent .........................

## INSTIGATING PROCESS

7. On 16 July 2018 NSW Police Force investigator Detective Sergeant Richard Michael Howe created a Court Attendance Notice (CAN) for the charge of murder against DION. This document is the initiating process by which a prosecution is commenced in the Local Court of NSW. A true copy of that CAN is annexed to this affidavit and marked 'B'.

## SUMMARY OF THE ACTS AND OMISSIONS ALLEGED AGAINST DION IN RESPECT OF THE OFFENCE

8. Between Friday 25 May 2018 and Sunday 27 May 2018 DION murdered Wachira PHETMANG by inflicting over 20 wounds to PHETMANG'S head resulting in fatal head injuries. DION disposed of PHETMANG'S body in bush adjacent to Homebush Bay Drive in Sydney Olympic Park in Sydney and later disposed of certain items of PHETMANG'S clothing and possessions at a building site in East Killara in Sydney. DION departed Australia for the US on 27 May 2018 in possession of PHETMANG'S mobile phones and credit cards.

## DETAILED STATEMENT OF ACTS AND OMISSIONS ALLEGED AGAINST DION IN RESPECT OF THE OFFENCE

9. A detailed statement of the acts and omissions alleged in respect of the offence is set out in the Investigator's Affidavit sworn by Detective Sergeant Richard Michael Howe.

10. It is my opinion that the acts and omissions of DION as set out in the Investigator's Affidavit constitute the offence referred to in the arrest warrant dated 11 September 2018.

## OFFENCE AND PENALTY PROVISIONS

11. The Crimes Act was enacted by the legislature of NSW to consolidate the statutes relating to Criminal Law. The Crimes Act is a law of NSW and has operation throughout the State of NSW.

12. Paragraph 18(1)(a) of the Crimes Act provides:

(1) (a) Murder shall be taken to have been committed where the act of the accused, or thing by him or her omitted to be done, causing the death charged, was done or omitted with reckless indifference to human life, or with intent to kill or inflict grievous bodily harm upon some person, or done in an attempt to commit, or during or immediately after the commission, by the accused, or some accomplice with him or her, of a crime punishable by imprisonment for life or for 25 years.

## STATEMENT OF TIME LIMIT ON THE INSTITUTION OF PROCEEDINGS FOR THE OFFENCE

13. There is no time limitation period for the instigation of prosecution for the offence for which the extradition is sought.

## DOUBLE JEOPARDY

14. DION has not previously been charged with the offence and he is not entitled to be discharged under any rule of law relating to previous acquittal or conviction.

Magistrate .................................        Deponent .................................

3

SWORN by the Deponent
at *Sydney* on the
2nd day of October 2018.

Before me:

_____
Magistrate of the State of New South Wales

_____
Deponent



Magistrate ..................

Deponent ..................

'A'

**[THIS AND THE FOLLOWING TWO PAGES CONSTITUTE ANNEXURE 'A']**

Magistrate ..................................

Deponent ..................................



**WARRANT**
Criminal Procedure Act, 1986

**Local Court of NSW
at Parramatta
2018/00218239**



D00011GOBC

| To | All police officers.<br><br>This is your warrant to arrest ALEX DION. |
|---|---|
| **Order(s)** | Name      **ALEX DION**<br><br>Address<br>DOB      3 June 1980<br><br>CNI      812007822<br><br>MIN<br>Arrest and bring ALEX DION to the court to be dealt with according to law. |
| **Reason** | A Court attendance Notice has been filed in respect of the following offences. This warrant has been issued by an authorised officer upon application of Det Sen Con Scott Ford of State Crime Command, Homicide Squad prior to court listing. This warrant is issued under section 54(2)/181(2) of the Criminal Procedure Act 1986. The Court Attendance Notice(s) were filed at Parramatta on 16/07/2018.<br><br>2018/00218239-001<br>Offence      : Seq 1 - Actual offence - Murder-SI<br>Act & section : Crimes Act 1900 40/1900 (18(1)(a))<br>Lawpart Code: 2<br>H Number – sequence: 68389646 1, 7772863<br>Date and Place of Offence: 25 May 2018, SYDNEY 2000 |



A'

| Signed | |
|---|---|
| | John Crittenden<br>Authorised officer |
| Date | 11 September 2018 |

'B'

**[THIS AND THE FOLLOWING PAGE CONSTITUTE ANNEXURE 'B']**

Magistrate .....................

Deponent .....................

# COURT ATTENDANCE NOTICE
## (PROSECUTOR COPY)
### (S40 OF BAIL ACT 2013 MAY APPLY)

B

DION
H 68389646
1
Offence Ref No. 7772863
Bail :

Issued at PARRAMATTA LOCAL Court.

## DEFENDANT DETAILS

DION, Alex
03/06/1980
00000
0

| | |
|---|---|
| CNI Number | : 812007822 |
| Licence details | :18982785 - VIC |
| Sex | : Male |
| ATSI Status | : |

## PROSECUTOR (NSW POLICE) DETAILS

OIC (Prosecutor) : DETSGT RICHARD HOWE, Scc Homicide Squad
Created by : DETSGT RICHARD HOWE, 11:36 am 16/07/2018
Accepted by : DETSGT DARRYN GUNN
Apprehended :
Apprehended by :

Charging station : Scc Homicide Squad

## DETAILS OF OFFENCE/S

Crimes Act 1900, Section 18(1)(a)                                    Law Part Code 2 - SI

Murder

between 7:30 pm on 25/05/2018 and 9:00 pm on 27/05/2018 at Sydney.

That Alex DION between the 25th day of May 2018, and the 27th day of May 2018, at SYDNEY, in the State of New South Wales, did murder Wachira (Mario) PHETMANG.

